SULLIVAN, PAPAIN, BLOCK,
McMANUS, COFFINAS & CANNAVO P.C.
25 Main Street – Suite 602
Hackensack, New Jersey 07601
(201) 342-0037
Email: mapostolos@triallaw1.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF GRIMALDI DEEP SEA SPA AS OWNER/OPERATOR OF M/V GRANDE COSTA D'AVORIO FOR EXONERATION FROM OR LIMITATION OF LIABILITY | Civil Action No 2:23-CV-20340 (JXN)-(JBC)<br><br>HON. JULIEN XAVIER NEALS |
| MARIA ACABOU, individually and as Administrator of the Estate of AUGUSTO ACABOU, deceased and MICHELE BROOKS, individually and as Administrator of the Estate of WAYNE BROOKS JR., deceased<br>    *Respondents/Claimants/Third Party Plaintiffs*,<br>           vs.<br><br>AMERICAN MARITIME SERVICES OF NEW YORK, INC., PORTS AMERICA, INC., PORT NEWARK CONTAINER TERMINAL LLC, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, THE CITY OF NEWARK and THE CITY OF NEWARK FIRE DEPARTMENT,<br>    *Third Party Defendants*. | |

## RESPONDENTS/CLAIMANTS/THIRD PARTY PLAINTIFFS' BRIEF IN OPPOSITION TO THIRD PARTY DEFENDANT PANYNJ'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(c)

SULLIVAN PAPAIN BLOCK MCMANUS COFFINAS & CANNAVO P.C.
25 MAIN STREET, SUITE 602
HACKENSACK, NEW JERSEY 07601
(201)342-0037

TABLE OF CONTENTS

Page

TABLE OF CASES AND AUTHORITIES……………………………………..ii

Preliminary Statement……………………………………………………………..1

A Summary Of The Pertinent Facts…………………………………………….2

PANYNJ's Motion For Judgment On The Pleadings………………………....5

POINT
PANYNJ'S MOTION FOR JUDGMENT ON THE PLEADINGS
SHOULD BE DENIED SINCE DISCOVERY IS NECESSARY TO
DETERMINE THE EXTENT TO WHICH IT RETAINED CONTROL
SO AS TO SATISFY ITS LEASE OBLIGATION "TO KEEP THE
DEMISED PREMISES IN GOOD CONDITION" ………………………..8

A.    Standard Of Review Governing Fed. R. Civ. P. 12(c) Motions………....8

B.    The Allegations Set Forth In Claimants' Complaint…………………....9

C.    The Allegations Set Forth In Grimaldi's Counterclaim………………..10

D.    Discovery Is Necessary To Determine How PANYNJ
       Previously Satisfied Its Obligation Under Section 6 Of The
       Lease To "Take Good Care Of The Demised Premises" And
       "Keep The Demised Premises In Good Condition" *Vis-à-vis*
       Dangerous Equipment Used To Load Cargo………………………..12

E.    *McBride* Is Distinguishable Since, Unlike *McBride*, Section 6
       Of PANYNJ's Lease Created Contractual Obligation To
       "Keep The Demised Premises In Good Condition" …………………14

F.    Tariff Provisions Also Preclude PANYNJ From
       Entitlement To Judgment On The Pleadings…………………………16

G.    Denial of PANYNJ's Motion Is Likewise Consistent With
       The Public Policy Underlying The Firefighter Statute,
       N.J.S.A. 2A:62A-21………………………………………………...18

CONCLUSION………………………………………………………………….19

## TABLE OF CASES AND AUTHORITIES

CASES                                                                 Page

*Cabrera v. Nazor*, No. 23-cv-2745, 2025 WL 3251458  (D.N.J. Nov. 21, 2025) …………………………………………………………….8

*Dewulf v. Blatt Billiard Corp*, Civ. No. 22-04851 (KM)(AME), 2023 WL 3199192 (D.N.J. May 2, 2023)…………………………………..13

*McBride v. Port Authority of New York and New Jersey*, 295 N.J.Super 521 (App.Div.1996) ………………………………...1,6,14,15,17

*Ruiz v. Mero*, 189 N.J. 525 (2007)………………………………………….18

*Shields v. Ramslee Motors*, 240 N.J. 479 (2020)…………………………………15


FEDERAL STATUTES

Fed. R. Civ. P. 12(c)……………………………………………….. *passim*


NEW JERSEY STATUTES

N.J.S.A. § 2A:62A-21…………………………………………………3,18

Preliminary Statement

Third party defendant Port Authority of New York and New Jersey ("PANYNJ") has moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings dismissing all claims against it.  Reduced to a single sentence, PANYNJ's motion for judgment on the pleadings is based on the argument that, under *McBride v. Port Authority of New York and New Jersey*, 295 N.J.Super 521 (App.Div.1996), PANYNJ was a mere out of possession commercial landlord who, supposedly, had no contractual responsibilities as a matter of law to its tenants or third-parties for any mishap that occurs to anyone injured on the leased premises because of any dangerous condition on the premises irrespective of the degree it retained control over the leased premises. That argument fails since, as will be demonstrated, Section 6 of its 1947 Lease with the City of Newark -- which PANYNJ attached as Exhibit B to its motion (Document 187-4, p.8) -- specifically provided, unlike *McBride*, that PANYNJ was obligated to "take good care of the demised Premises" and "shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and *keep the demised premises in good condition*…" (emphasis added)  As such, discovery is necessary to determine the degree to which PANYNJ has exercised control over the premises so as to satisfy its obligation "to keep the demised premises in good condition" *vis-a-vis* dangerous equipment being used to load cargo on the premises.

This brief in opposition is submitted on behalf of Maria Acabou, Michele Brooks, and the Estates of Augusto Acabou and Wayne Brooks, the two deceased

1

firefighters.  Augusto Acabou, then 45 years old, and Wayne Brooks, Jr., then 49 years old, were two City of Newark firefighters who died from injuries sustained in the course of fighting the subject fire on the night of July 5, 2023 aboard the GRIMALDI DEEP SEA, SPA ("Grimaldi") M/V Grande Costa D'Avorio (the "Vessel") at Port Newark Marine Terminal.  Maria Acabou and Michele Brooks are, respectively, the deceased firefighters' mother and widow, and also the administrators of their respective estates. Collectively, Mrs. Acabou and Mrs. Brooks are referred to as "Claimants."

<u>A Summary Of The Pertinent Facts</u>

Claimants have alleged that the negligence of multiple parties, at least in part, contributed to the deaths of these two firefighters.  The parties alleged by Claimants to be responsible are Grimaldi, as the owner and operator of the subject vessel; AMERICAN MARITIME SERVICES OF NEW YORK, INC. ("AMS"), as the operator of a Jeep Wrangler being used to push vehicle cargo onto the Vessel (the "pusher vehicle"), and which Jeep started the fire; PORTS AMERICA, INC. ("Ports America"), as the owner of the pusher vehicle; the movant herein PORT AUTHORITY OF NEW YORK AND NEW JERSEY ("PANYNJ") as the owner and operator of the port where AMS and Ports America were operating the pusher vehicle; and CITY OF NEWARK FIRE DEPARTMENT as the owner and operator of the City of Newark Fire Department, which employed, equipped and trained both deceased firefighters.

2

It is undisputed that the fire started within the Vessel's vehicle cargo compartment on the 10th deck as the Vessel was loading cargo of approximately 1,200 new and used automobiles headed for West Africa. The fire began when a Jeep Wrangler "Pusher" vehicle ("the pusher vehicle") was in the process of pushing much heavier disabled vehicle cargo onto the Vessel, thereby repeatedly overheating the Jeep. According to the testimony taken at the Coast Guard hearing, this pusher vehicle was taken out of service earlier on July 5, 2023, by AMS employees. They further explained that this pusher vehicle would regularly experience overheating issues. Testimony was elicited that the "hot oil" warning light would regularly be flashing while the vehicle was being used to load cargo. On the night in question, the pusher vehicle caught fire, and the fire quickly spread throughout decks 10, 11 and 12 of the Vessel. It was in the course of fighting that fire that Augusto Acabou and Wayne Brooks, Jr. were killed.

As a result of the deaths of these two firefighters, Claimants filed a timely Third-Party Complaint against the above named third-party defendants within the instant Limitation of Liability proceeding (Document 23). In sum, Claimants asserted the following claims against PANYNJ:

(i)     Negligence (Count I, ¶¶ 69-76);

(ii)    Liability pursuant to N.J.S.A. 2A:62A-21. The latter statute -- which abolished the common law "Firefighters' Rule" -- is titled "Rights of recovery granted to law enforcement officers, fire fighters and emergency service personnel or their

estates in cases of injury or death resulting from neglect, willful omission or culpable conduct" (Count III, ¶¶ 86-97);

(iii)    *Per quod, i.e.,* Claimants' loss of services and consortium under New Jersey law (Count IV, ¶¶ 98-99);

(iv)    Wrongful death pursuant to general maritime law (Count V, ¶¶100-05); and

(v)    Wrongful death pursuant to New Jersey state law (Count VI, ¶¶ 106-11).

For purposes of providing an overall view of this litigation, Claimants briefly summarize in general terms what our theories of liability against these parties are:

1.    AMS and Ports America are alleged to be liable for starting the fire by misusing a dangerous Jeep pusher vehicle, which was not able nor equipped to be able to move heavy cargo in the manner in which it was being. Because of that misuse, the vehicle repeatedly overheated and caught fire. Besides their misuse, these defendants had notice that the pusher vehicle was experiencing mechanic issues and regularly overheating, yet continued to use the vehicle until it started the fire;

2.    Grimaldi is alleged to be liable for failing to extinguish the fire. The Vessel had an on-board carbon dioxide fire suppression system which is generally highly effective at extinguishing fires. The crew was unable to properly discharge the Vessel's $CO_2$ fire suppression system, which allowed the fire to burn and spread. Because of their failure, the Newark Fire Department had to respond in the manner in which they did.

4

3.    The PANYNJ is alleged to be liable for failing to supervise their own Port, where AMS and Ports America were working, and ensure that cargo was being loaded safely and with appropriate tools and safe equipment. It failed to stop the unsafe work being performed by AMS and Ports America with an unsafe Jeep pusher vehicle being used to load cargo.

4.    The City of Newark is alleged to be liable for failing to equip and train Mr. Brooks and Mr. Acabou (or any of their firefighters) in anyway, on the specialized skills necessary how to fight a fire aboard a large cargo ship. Both firefighters had never even been on a cargo ship, let alone received any training on how to fight a fire on one.  Their radio equipment failed while fighting the fire.  Ultimately, their lack of training and equipment were substantial factors which led to their deaths.

<u>PANYNJ's Motion For Judgment On The Pleadings</u>

On March 23, 2026, PANYNJ moved (Document 187) for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Attaching both a Tariff Schedule published in January 2023 (Document 187-3) -- *i.e.*, a schedule of the "Rates and Charges Applicable For the Use of Public Areas At Port Authority Marine Terminals" -- and a Lease between the City of Newark and The Port of New York Authority "with respect to The Newark Marine And Air Terminals" dated October 22, 1947 (Document 187-4), PANYNJ argued in its Brief in support of the motion (Document 187-1) that, as a mere out of possession landlord, it was entitled to dismissal supposedly because it had

5

neither agreement nor duty as a matter of law in the Lease to either ensure that Grimaldi conducted its own cargo operations safely, or was responsible for firefighting operations at the Port or of the training of firefighters.   In that regard, it relied principally on *McBride v. Port Authority of New York and New Jersey*, 295 N.J.Super 521 (App.Div.1996). See PANYNJ Brief at pages 3, 10 and 11.   Although we address *McBride* fully in the argument section of our Brief, we reiterate here that PANYNJ's reliance on *McBride* fails here since, unlike *McBride*, Section 6 of PANYNJ's Lease with the City of Newark (Exhibit B to its motion, Document 187-4, p. 8) specifically provided that PANYNJ was obligated to "take good care of the demised Premises" and "shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and keep the demised premises in good condition…"

Conveniently omitted in PANYNJ's Brief was any mention or discussion of what was labelled SUBRULE 34-001 at page 7 of the Tariff, which provided as follows:

> No provision in this tariff limits or otherwise relieves THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY from liability for *its own negligence* or imposes on others the obligation to indemnify or hold harmless THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY from liability *for its own negligence*. (emphasis added)

Likewise conveniently omitted from PANYNJ's brief was any mention of Section 6 of the Lease (Document 187-4 p. 8) as alluded to above, setting forth PANYNJ's obligations with respect to "Repairs":

6

6.    <u>Repairs</u>

The Port Authority shall take good care of the demised Premises together with all improvements, fixtures and personal property therein, whether now on the premises. or hereafter. added, and *shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and keep the demised premises in good condition,* ordinary wear and tear excepted. (emphasis added)

We note finally that Claimants have not had any opportunity to conduct discovery against PANYNJ.  In light of Section 6 of its Lease with the City of Newark obligating it to "take good care of the demised Premises" and "shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and keep the demised premises in good condition…," such discovery would obviously entail examination as to how PANYNJ has previously satisfied this obligation in the near ninety years since this Lease was signed *vis-a-vis* any dangerous conditions or unsafe equipment being used to load cargo on the leased premises that it knew or should have known about.

7

POINT

PANYNJ'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED SINCE DISCOVERY IS NECESSARY TO DETERMINE THE EXTENT TO WHICH IT RETAINED CONTROL SO AS TO SATISFY ITS LEASE OBLIGATION "TO KEEP THE DEMISED PREMISES IN GOOD CONDITION"

A.    Standard Of Review Governing Fed. R. Civ. P. 12(c) Motions

There is no dispute as the standard of review by which PANYNJ's motion for judgment on the pleadings should be decided.  As Judge Cecchi explained in *Cabrera v. Nazor*, No. 23-cv-2745, 2025 WL 3251458 at \*4 (D.N.J. Nov. 21, 2025):

> The Court may grant a motion for judgment on the pleadings only if "no material issue of fact remains to be resolved" and the movant "is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citation omitted).; *see Mosley v. New Jersey*, No. 20-18885, 2022 WL 3913739, at \*3 (D.N.J. Aug. 31, 2022). The moving party is entitled to judgment as a matter of law when "no relief could be granted under any set of facts that could be proved." *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991); *see Bibbs v. Trans Union LLC*, 43 F.4th 331, 339 (3d Cir. 2022) ("*A plaintiff can survive a Rule 12(c) motion if her complaint contains 'sufficient factual matter to show that the claim is facially plausible, thus enabling the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.' " (alteration in original) (citation omitted)). In considering a Rule 12(c) motion, the Court "will accept the complaint's well-ple[d] allegations as true[ ] and construe [them] in the light most favorable to the nonmoving party.*" *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008); *id.* ("The [C]ourt ... will not accept unsupported conclusory statements."). The standard for deciding a Rule 12(c) motion for judgment on the pleadings is identical to that under Rule 12(b)(6). *See Turbe*, 938 F.2d at 428; *Kramer v. City of Jersey City*, No. 09-3767, 2010 WL 2326259, at \*3 (D.N.J. June 3, 2010), *aff'd*, 455 F. App'x 204 (3d Cir. 2011). (emphasis added)(footnote omitted)

8

B.      <u>The Allegations Set Forth In Claimants' Complaint</u>

Since PANYNJ's motion under Fed. R. Civ. P. 12(c) must be tested by whether

the allegations set forth in the pleadings the pleadings of Claimants and Third-Party

Defendants, when read in light most favorable to opposing parties, are facially plausible

and well pled, the logical place to start is with those allegations.  The allegations in

Claimants' complaint against PANYNJ were grouped with the allegations against AMS,

Ports America and Port Newark Container Terminal (Document 23) as follows:

> 70.    At all times relevant, defendants, AMS, PORTS AMERICA, INC., PNCT, and THE PORT AUTHORITY, owed a legal duty to own, maintain, operate and/or control the subject port, the cargo, the pusher vehicle, and all other vehicles and/or equipment being used to load cargo aboard the Vessel in a reasonable safe manner and with reasonable care under the circumstances.

> 71.    At all times relevant, the defendants AMS, PORTS AMERICA, INC., PNCT and THE PORT AUTHORITY, breached their aforementioned duties and/or were negligent, careless and reckless in the ownership, operation, maintenance and control of the subject port, the cargo, the pusher vehicle, and all other vehicles and/or equipment being used to load cargo aboard the Vessel *inter alia*, in negligently starting and/or causing the fire<u>;</u> in failing to maintain the pusher vehicle in safe condition; in failing to properly service the pusher vehicle; in using improper vehicles and/or equipment to load cargo aboard the Vessel; in negligently maneuvering and/or pushing the cargo onto the Vessel so as to cause the fire; <u>*in failing to take the pusher vehicle out of service*</u>; in negligently using the pusher vehicle to push cargo onto the Vessel despite known mechanical issues; in negligently modifying the pusher vehicle; in failing to correct a dangerous and defective condition within the pusher vehicle; in negligently allowing and causing the pusher vehicle to overheat and start a fire; in failing to use the appropriate type of vehicle and/or equipment to push the cargo aboard the Vessel; in failing to suppress and/or fight the fire; in failing to alert the Vessel's crew of the fire in a timely manner; in failing to notify the local fire department of the subject fire in a timely manner; in failing to properly supervise and control the subject port; in

9

otherwise being negligent in causing and contributing to the fire and the spread of the fire. (emphasis added)

72.    At all times relevant, the defendants AMS, PORTS AMERICA, INC., PNCT, and THE PORT AUTHORITY, were on actual and/or constructive notice of the dangerous and defective condition(s) that caused the subject fire and the injuries and deaths sustained by decedents.

73.    At all times relevant, the defendants AMS, PORTS AMERICA, INC., PNCT, and THE PORT AUTHORITY, caused and created the dangerous and defective condition(s) that caused the subject fire and the injuries and deaths sustained by decedents.

74.    The aforementioned negligence was a direct and proximate cause and/or substantial factor in causing decedents' pain and suffering, injuries and death.

C.    The Allegations Set Forth In Grimaldi's Counterclaim

The allegations in Grimaldi's counterclaim against PANYNJ (Document 113)

were different than those set forth in Claimants' Complaint and are as follows:

44.    Prior to July 5, 2023, PANYNJ issues "Airport Rules and Regulations" which prohibited, among other things, operating any vehicle "in a manner which creates an unreasonable risk of harm to persons or property…." Airport Rules and Regulations, section VI. B. 6., at p. 15. With respect to Port Newark, Subrules of the tariff published in January 2023, prohibited improper handling of cargo (Subrule 34-145), required that "stevedore work… must be performed in a manner and with equipment satisfactory to the Port Authority. . .." (Subrule 34-150), prohibited "equipment driven by internal combustion engines within a terminal, if the construction or condition of such equipment constitutes a fire hazard in the opinion of the Manager" (Subrule 34-225), and provided that "No person shall, in or upon a terminal do or omit to do any act if the doing or omission thereof endangers unreasonably or is likely to endanger unreasonably person or property." (Subrule 34-230).

45.    Upon information and belief, the PANYNJ did not prohibit Ports America and American Maritime Services from using the Jeep

10

Wrangler as a pusher vehicle, notwithstanding that it had been recalled for overheating and potentially causing a fire, had overheated on numerous occasions prior to the fire on July 5, 2023, and was improper equipment to use as a pusher vehicle because of its weight in comparison the some of the heavier vehicles it was attempting to push placed a dangerous strain on its transmission.

46. Upon information and belief, PANYNJ had no safety management system in place at Port Newark prior to July 5, 2023, for managing or regulating the safe operation of pusher vehicles at the marine terminal there.

47. PANYNJ had no safety management system to evaluate the equipment being used by Ports America and AMS as pusher vehicles and did not enforce the applicable Tariff Subrules related to such equipment.

48. Upon information and belief, prior to July 5, 2023, PANYNJ never examined or evaluated the Jeep Wrangler pusher vehicle that started the fire aboard the Vessel.

49. Upon information and belief, had PANYNJ examined or evaluated the Jeep Wrangler pusher vehicle for safety before July 5, 2023, it would have discovered that the vehicle was a potential fire hazard as it was being used by Ports America and AMS as a pusher vehicle; upon recognizing this fire hazard, PANYNJ would more likely than not have concluded that Jeep Wrangler was "likely to endanger unreasonably person or property," and immediately ordered its tenant, Ports America, to stop using it to load non-running cargo vehicles on to ships. *The PANYNJ's failure to examine or evaluate the Jeep Wrangler pusher vehicle that started the fire aboard the Vessel was a direct and proximate cause of the fire*. (emphasis added)

50. *PANYNJ had a duty under common law maritime negligence standards, and under its tariff, to prevent its tenant, Ports America, from using unsafe equipment that could endanger lives and property on Port Newark.* (emphasis added)

51. *Had PANYNJ ordered Ports America and AMS to immediately cease and desist from using the Jeep Wrangler any time prior to July 5, 2023, the Jeep Wrangler would not have been used on July 5, 2023, to load non-running cargo vehicles on the Vessel and the fire would not have occurred,* the Newark

11

firefighters would not have lost their lives in the fire, and the ship would not have been damaged. (emphasis added)

52.     The fire aboard the Vessel was therefore caused and/or proximately caused by the fault, negligence, gross negligence, and/or omission of PANYNJ and its management.

53.     *The failure of PANYNJ to have in place an effective safety management system directly resulted in unsafe equipment being used by Ports America and AMS, which was a direct and proximate cause of the fire aboard the Grande Costa D'Avorio on July 5, 2025.*

54.     The fire resulted in the deaths of two firefighters, and the Vessel sustained substantial damage.

D.     Discovery Is Necessary To Determine How PANYNJ Previously Satisfied Its Obligation Under Section 6 Of The Lease To "Take Good Care Of The Demised Premises" And "Keep The Demised Premises In Good Condition" *Vis-A-Vis* Dangerous Equipment Used To Load Cargo

As previously pointed out, PANYNJ attached the 1947 Lease with the City of Newark ( (Document 187-4) which obligated it to "take good care of the demised Premises" and "shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and keep the demised premises in good condition…." Thus, although we know with certainty that PANYNJ, in fact, had a contractual obligation to this extent, we do *not* know from PANYNJ's motion to what extent it had previously supervised its tenants so as comply with this obligation *vis-a-vis* dangerous equipment being used to load cargo that it knew or should have known about.  Both Claimants (Document 23, ¶ 71) and Grimaldi (Document 113, ¶49-50) have alleged that PANYNJ had a duty to and was negligent in failing to ensure that a dangerous piece of equipment such as the Jeep Pusher Vehicle

12

would not be used to load cargo.  In light of PANYNJ's Section 6 obligation to "keep the demised premises in good repair," Claimants' and Grimaldi's allegations in this regard are facially plausible and well-pled.  In that regard, the case law shows that where discovery is necessary to determine whether judgment on pleadings is warranted, the motion should be denied. *See Dewulf v. Blatt Billiard Corp*, Civ. No. 22-04851 (KM)(AME), 2023 WL 3199192 at *6 (D.N.J. May 2, 2023)("Whether the discovery rule applies to DeWulf's claims, and whether his claims are nevertheless barred, are questions I cannot answer at this stage… The record is not sufficiently developed to justify such a determination at this time. I will therefore deny the motion for judgment on the pleadings as to Counts 2 and 3 as well.").

PANYNJ's reliance on the Section 21(B) of the Lease (Document 187-4 at p. 19) -- which obligates the City of Newark to "provide general police and fire protection" at the Marine Terminal -- does not dispose of this motion in PANYNJ's favor as a matter of law since, as has been seen, Claimants and Grimaldi have alleged PANYNJ had a duty to ensure that an unsafe pusher vehicle was not used to load cargo where PANYNJ knew or should have known such unsafe equipment was being used.  That allegation is facially plausible and well-pled given PANYNJ's obligation to "maintain and preserve them in good order and condition and keep the demised premises in good condition".

Nor is PANYNJ entitled to judgment on the pleadings pursuant to Subrule 34-150 of the Tariff labeled "Cargo Handling" (Document 187-3, p. 18) -- "All stevedoring work, and the handling of cargo to and from terminal, must be performed in a manner

13

and with equipment satisfactory to the Port Authority from a safety standpoint, but the Port Authority assumes no responsibility for the performance of such work" -- since that provision does not expressly state it was intended to supersede Section 6 of the Lease requiring PANYNJ "to maintain and preserve them in good order and condition and keep the demised premises in good condition…"

> E.     *McBride* Is Distinguishable Since, Unlike *McBride*, Section 6
> Of PANYNJ's Lease Created Contractual Obligation To
> <u>"Keep The Demised Premises In Good Condition"</u>

PANYNJ's reliance on *McBride* is misplaced inasmuch as there is a night versus day difference in PANYNJ's contractual obligations between *McBride* and the instant case.  In *McBride*, the PANYNJ leased a 300,000 square foot warehouse to Hudson Refrigerating Company.  In the accident which precipitated the decision, an employee of Hudson Refrigerating Company sued PANYNJ as premises owner "when the vehicle he was operating on his employer's loading dock at the leased premises struck a hole which caused the vehicle to jerk, throwing him to the ground and seriously fracturing his heel." *Id.* at 524.  PANYNJ moved for a directed verdict based on the argument that, as a commercial landlord, it had no duty to repair the premises under the lease which motion was denied.  But the New Jersey Appellate Division absolved PANYNJ from liability based upon finding that Hudson had exclusive possession of warehouse and responsibility for maintenance and repair (*McBride*, 295 N.J. Super at 526-27):

> The contractual arrangement between defendant Port Authority of New York and New Jersey and the injured plaintiff's employer, Hudson Refrigerating Company, set forth above, contains no ambiguity with

14

regard to responsibility for maintenance and repairs with regard to the loading dock which was the site of the accident. Section 7 places the onus on the lessee. And although Section 13 reserves a right in the landlord to perform repairs if the tenant fails to meet its contractual obligations, it contains no covenant by the landlord to do so.

But as we've already pointed out, the Lease provision here is nothing at all like the *McBride* provision.  As the Appellate Division in *McBride* makes clear, the repair/right of reentry provision in the *McBride* lease was completely opposite to that of the instant case (295 N.J. Super at 524, referring to Section 13, "Rights of Reentry Reserved):

> (d)) Nothing in this Section shall or shall be construed to impose upon the Port Authority any obligations so to construct or maintain or to make repairs, replacements, alterations or additions, or shall create any liability for any failure so to do. The Lessee is and shall be in exclusive control and possession of the premises and the Port Authority shall not in any event be liable for any injury or damage to any property or to any person happening on or about the premises nor for any injury or damage to the premises nor to any property of the Lessee or of any other person located in or thereon (other than those occasioned by the acts of the Port Authority).

The very distinction that PANYNJ has failed to appreciate in this case between a lease provision allowing the landlord the right of reentry versus, as here, an affirmative obligation to repair and keep the premises in good condition, was observed by the Supreme Court of New Jersey in *Shields v. Ramslee Motors*, 240 N.J. 479 (2020).  Citing *McBride*, the Court stated (at 489):

> The provision through which the landlord retained the right to enter the property without notice for the purpose of making repairs "necessary for the safety and preservation of the" property does not change our view. First, the lease specifically stated that the right to enter did not create "an obligation on the part of the Landlord to make such repairs." Second, as

15

this Court held over sixty years ago, a reservation of a right to enter is not the same as a covenant to make repairs; rather, the "right or opportunity to enter the leased premises to perform the covenant [to repair] is, of course, something else, since the basis of liability is negligence." *Michaels v. Brookchester, Inc.,* 26 N.J. 379, 385, 140 A.2d 199 (1958). *Since that decision, New Jersey courts have distinguished between the right to enter and a covenant to repair.* See, e.g., *McBride v. Port Auth. of N.Y. & N.J.,* 295 N.J. Super. 521, 525, 685 A.2d 520 (App. Div. 1996). In light of that distinction, "plaintiff['s] thesis that a commercial landlord should be held responsible to a tenant's employee injured on the leased premises because it reserved the right to enter the leased premises to perform repairs is inconsistent with the law of this State." *Ibid.* (emphasis added)

F.    Tariff Provisions Also Preclude PANYNJ From
       Entitlement To Judgment On The Pleadings

We believe Section 6 of the Lease requiring PANYNJ to "take good care of the demised Premises" and "shall make all necessary repairs, inside and outside, structural or otherwise, so as to maintain and preserve them in good order and condition and keep the demised premises in good condition…" standing alone is sufficient to warrant denial of PANYNJ's motion for judgment on the pleadings even without regard to the Tariff. Nevertheless, there are two provisions in the Tariff which are separately problematic on PANYNJ's motion. As previously alluded, Subrule 34-150 of the Tariff labeled "Cargo Handling" (Document 187-3, p. 18) provides "All stevedoring work, and the handling of cargo to and from terminal, must be performed in a manner and with equipment satisfactory to the Port Authority from a safety standpoint, but the Port Authority assumes no responsibility for the performance of such work." But there is no showing by PANYNJ on its motion that it didn't perform any inspections of the

16

stevedoring work so as to comply with Section 6 of the Lease.  Obviously, the "no responsibility" language which PANYNJ relies on in the Tariff is addressed to *Grimaldi*, not claimants who weren't parties to this contract and thus, any disclaimer of liability on this document should not be imputed to Claimants (at least not as a matter of law). This is different from *McBride* where Hudson Refrigerating Company was, in fact, the plaintiff's employer.  But here Grimaldi is not plaintiff's employer; plaintiffs are unrelated third parties who allegedly were injured by PANYNJ's neglect.

A second Tariff provision which is problematic to PANYNJ on this motion is Subrule 34-280.  Entitled "MATERIAL HANDLING EQUIPMENT - PERMIT TO USE," it provides:

> No motorized equipment except over-the-road trucks (not including straddle lift trucks) used or to be used in the handling of waterborne freight in or upon a public wharf, public mooring facility, public cargo facility or public storage area or facility at any Port Authority Marine Terminal shall be operated in or upon any such public wharf, facility or area except by persons authorized by the Manager of the Marine Terminal who may require that there be displayed on such motorized equipment identifying symbols or numbers.

A fair inference to be gleaned from this provision is that PANYNJ may, in fact, have been performing some level of inspections of the Port given this requirement for its leasees to provide identifying symbols or numbers on their vehicles.  Of course, since no discovery has ever taken place of PANYNJ and its motion is not accompanied with an affidavit from a PANYNJ employee affirmatively stating no inspections ever were performed, this possibility remains facially plausible.

17

G.      Denial of PANYNJ's Motion Is Likewise Consistent With The
<u>Public Policy Underlying The Firefighter Statute, N.J.S.A. 2A:62A-21</u>

It should also not be forgotten that this case involves the deaths of two firefighters. That, in turn, implicates the strong New Jersey public policy in favor of protecting firefighters and first responders under N.J.S.A. 2A:62A-21. The latter -- entitled "Rights of recovery granted to law enforcement officers, fire fighters and emergency service personnel or their estates in cases of injury or death resulting from neglect, willful omission or culpable conduct" -- provides as follows:

> In addition to any other right of action or recovery otherwise available under law, whenever any law enforcement officer, firefighter, or member of a duly incorporated first aid, emergency, ambulance or rescue squad association suffers any injury, disease or death while in the lawful discharge of his official duties and that injury, disease or death is *directly or indirectly t*he result of the neglect, willful omission, or willful or culpable conduct of any person or entity, other than that law enforcement officer, firefighter or first aid, emergency, ambulance or rescue squad member's employer or co-employee, the law enforcement officer, firefighter, or first aid, emergency, ambulance or rescue squad member suffering that injury or disease, or, in the case of death, a representative of that law enforcement officer, firefighter or first aid, emergency, ambulance or rescue squad member's estate, *may seek recovery and damages from the person or entity whose neglect, willful omission, or willful or culpable conduct resulted in that injury, disease or death*. (emphasis added)

The Supreme Court of New Jersey in *Ruiz v. Mero*, 189 N.J. 525 (2007), made it clear that the Legislature expressly intended to interpret this statute broadly to effectuate its purpose of permitting recovery even when the defendant's negligence or willful omission or culpable conduct only had an "indirect" effect on the element of causality (at 535):

18

To apply those principles, we turn again to the statutory language. The meaning of N.J.S.A. 2A:62A–21 seems clear—to provide a broad right of action to a first responder who is injured on the premises to which he has been called. It is broad because it encompasses all causes of action for both negligent and intentional acts, and it sweeps in injuries directly or indirectly resulting from those acts. No limits on the right of action are recognized except for those workers' compensation cases involving an employer or a co-employee.

The Firefighter's statute, because of its broad reach and greatly relaxed causation standard, is alone, grounds for denying this motion to permit discovery as to PANYNJ's liability in this matter, whether that be in a duty to maintain the port in a safe condition, train the City's fire fighters or fight the actual fire themselves.

## CONCLUSION

For all the foregoing reasons, Claimants/Third-Party Plaintiffs respectfully request that PANYNJ's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) be denied in its entirety.

Dated: May 4, 2026

> Respectfully submitted,
>
> **SULLIVAN PAPAIN BLOCK**
> **McMANUS COFFINAS & CANNAVO P.C.**
> Attorneys for Claimants/Third-Party Plaintiffs
>
> By:
> _____
> MARK A. APOSTOLOS, ESQ.
> 25 Main Street, Suite 602
> Hackensack, New Jersey 07601

19